HANSON BRIDGETT LLP
DAVINA PUJARI, SBN 183407
dpujari@hansonbridgett.com
SAMIR J. ABDELNOUR, SBN 271636
sabdelnour@hansonbridgett.com
ROSSLYN HUMMER, SBN 190615
bhummer@hansonbridgett.com
MELISSA M. MALSTROM, SBN 314012
mmalstrom@hansonbridgett.com
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:     (415) 777-3200
Facsimile:      (415) 541-9366

Attorneys for Plaintiff
TETRA TECH EC, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TETRA TECH EC, INC., | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT FOR DECLARATORY RELIEF** |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; ANDREW R. WHEELER, as ADMINISTRATOR of the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; UNITED STATES DEPARTMENT OF THE NAVY; KENNETH J. BRAITHWAITE, as SECRETARY OF THE UNITED STATES NAVY, | Administrative Procedure Act, 5 U.S.C. § 551, *et seq.* |
| Defendants. | |

Plaintiff Tetra Tech EC, Inc. seeks a declaration from this Court that the Final Parcel G

Removal Site Evaluation Work Plan for the Former Hunters Point Naval Shipyard in

San Francisco, California (June 2019) (Final Parcel G Work Plan), prepared by the United States

Department of the Navy and approved by the United States Environmental Protection Agency, is

unlawful. Plaintiff seeks this declaration on the grounds that the Department of the Navy, the

Secretary of the Department of the Navy, the Environmental Protection Agency, and the

Administrator of the Environmental Protection Agency (together, Defendants) violated the

Administrative Procedure Act (APA) in preparing and approving the Final Parcel G Work Plan by (1) changing their position without articulating a reasoned explanation for the change, (2) relying on unproven allegations and draft documents that Defendants failed to include in the administrative record, (3) ignoring reliable, contrary evidence that did not fit their preordained outcome, and (4) violating applicable statutory provisions, regulations, and guidance documents governing their actions.

## I.      INTRODUCTION

1.      In late 2016, bowing to political pressure driven by a misinformed public outcry, Defendant United States Environmental Protection Agency (EPA) arbitrarily decided that *all* investigation and remediation of radionuclides conducted by Plaintiff Tetra Tech EC, Inc. (TtEC) at the former Hunters Point Naval Shipyard (Hunters Point)—which had been ongoing for more than a decade—had to be entirely redone. EPA claimed the rework was necessary because two former rogue employees of TtEC had pleaded guilty to falsifying a limited number of soil samples in some Hunters Point locations, so that meant that *none* of TtEC's data could be trusted. EPA arrived at this conclusion even though the data itself and other reliable evidence did not support it. EPA decided to start the rework at Parcel G.

2.      Defendant United States Department of the Navy (Navy) argued against EPA's position at first. The Navy recommended that all of TtEC's data be evaluated to confirm its reliability, rather than redoing the entire site remediation before the data evaluation was final. But, EPA forced the Navy to agree to its outcome-driven plan by threatening to withhold its approval to release remediated parcels at Hunters Point for redevelopment if the Navy did not acquiesce.

3.      EPA's decision was not driven by law or science; rather, EPA was trying to save face in the midst of public allegations of negligent regulatory oversight by forcing the Navy to redo all the radiological remediation work. Working backward from this position, EPA viewed TtEC's site data through a biased, unscientific lens and demanded an approach that guarantees a complete do-over at Parcel G.

4.      Defendants cast aside any consideration of the necessity or reasonableness of the costs associated with their arbitrary decision making, and are now determined to extract those

1   costs from TtEC.

2       5.      Defendants claim that the purpose of the Final Parcel G Work Plan "is to determine

3   whether current site conditions are compliant with the remedial action objective (RAO) in the

4   Parcel G Record of Decision (ROD) (Navy, 2009)" which seeks to "[p]revent exposure to

5   radionuclides of concern in concentrations that exceed remediation goals for all potentially

6   complete exposure pathways." Final Parcel G Work Plan, Executive Summary, at III; Parcel G

7   ROD, at 29. An "exposure pathway" is the way a person may come into contact with a hazardous

8   substance.

9       6.      However, Defendants failed to consider that thousands of cubic yards of

10  radiologically-impacted soil from Parcel G was already sent offsite for disposal, and thus poses no

11  current risk. Further, the remaining soil in Parcel G is currently overlain by a fully intact and

12  continuous "durable cover" which consists of hardscape (asphalt, concrete, and buildings). The

13  durable cover is a physical cap that prevents exposure to the soil underneath, and is a critical part

14  of the Navy's selected remedy for Parcel G, as detailed in the Parcel G ROD. The durable cover,

15  combined with institutional controls (i.e., land use restrictions), prevents exposure to any

16  remaining contaminants in the soil at Parcel G. The Parcel G selected remedy, which includes the

17  durable cover, was determined to be "protective of human health and the environment" and "cost-

18  effective." Parcel G ROD, Sec. 1.1—Selected Remedy, at 2. Given the soil removal that already

19  occurred, and the design and nature of the durable cover, Parcel G currently poses no risk of

20  exposure to any radionuclides of concern.

21      7.      Despite the protective nature of the durable cover and its importance as part of the

22  selected remedy for Parcel G, Defendants intend to tear off the durable cover and conduct

23  extensive re-excavation at Parcel G. This will create potential exposure pathways to radionuclides

24  of concern—the precise outcome Defendants claim they are trying to prevent.

25      8.      After spending tens of millions of dollars re-excavating Parcel G, Defendants will

26  then have to reconstruct the durable cover—essentially bringing the site conditions back to where

27  they are now. Thus, the net benefit of implementing the Final Parcel G Work Plan is zero. The

28  RAO is designed to prevent or minimize exposure to radionuclides of concern in concentrations

that exceed remediation goals for all potentially complete exposure pathways. The presence of the existing durable cover means that this RAO has been attained. And, Defendants made no finding to the contrary prior to preparation and approval of the Final Parcel G Work Plan.

9.    Instead of unnecessarily destroying the durable cover and re-excavating Parcel G, it would be safer, equally effective, and less costly to conduct confirmatory sampling by using a drilling rig to drill borings through the asphalt and concrete, collecting soil samples from extracted soil cores, and testing those samples for radionuclides. The use of borings and core sampling would be much simpler and less likely to result in exposure pathways because it would not require destroying the existing durable cover and excavating large amounts of underlying soil. However, Defendants did not consider this option—though TtEC brought it to their attention in comments on the Draft Parcel G Work Plan—in violation of the law.

10.    To justify their unlawful course of action, Defendants relied on unproven allegations by disgruntled former subcontractors, a draft desktop review of TtEC's environmental data by competitor consultants (which was done negligently and never finalized), and EPA's own selective and outcome-driven desktop data review. None of these materials were made part of the administrative record for Hunters Point. Nonetheless, Defendants used the allegations, the draft evaluation, and EPA's data review to conclude that TtEC's prior remediation work must be redone in Parcel G, as called for in the Final Parcel G Work Plan.

11.    Defendants' conclusions are contradicted by reliable evidence. TtEC and the Navy's investigation into a small number of soil sampling abnormalities identified in 2012 at Hunters Point found no anomalous samples associated with Parcel G. The two former rogue employees who admitted to falsifying samples collected in 2012 did not admit to any unauthorized sampling activities within Parcel G. Following the investigation into the anomalous samples, TtEC's Parcel G remediation data were approved by the Navy and EPA. The Hunters Point administrative record—and even the unreliable extra-record materials on which Defendants actually relied—simply do not justify Defendants' decision to have the Navy redo, and TtEC fund, all of the radiological remediation work in Parcel G.

12.    Defendants violated regulations and guidance documents mandating the procedures

to be followed when conducting a remedial cleanup under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). Defendants failed to comply with the National Oil and Hazardous Substances Pollution Contingency Plan (NCP), which governs the Hunters Point remedial action. Remediation costs that are inconsistent with the NCP are not recoverable. 42 U.S.C. § 9607(a)(4)(A). Defendants also ignored EPA's own guidance documents which dictate how to make and document CERCLA remedial decisions. Specifically, Defendants (1) relied on unproven allegations and draft documents that are not included in the administrative record, (2) failed to assess the current site conditions at Parcel G with the durable cover in place, (3) failed to consider the risks associated with destroying the durable cover, (4) failed to consider the costs versus the benefits of implementing the Final Parcel G Work Plan as opposed to other reasonable alternatives, and (5) failed to document remedial decisions that differ significantly from those set forth in the Parcel G ROD, either with a ROD amendment or an Explanation of Significant Differences (ESD).

13.    Because Defendants changed their position without reasoned explanation, violated applicable statutory provisions and regulations, and did not base their decisions on sound evidence and the administrative record, Defendants' preparation and approval of the Final Parcel G Work Plan violates the APA.

## II.    JURISDICTION AND VENUE

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States), and 5 U.S.C. §§ 702 (providing for judicial review of agency action under the APA).

15.    The United States has waived sovereign immunity for claims arising under the APA. 5 U.S.C. § 702.

16.    An actual controversy exists between the parties within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201(a), and this Court may grant declaratory relief and other relief pursuant to 28 U.S.C. §§ 2201–02 and 5 U.S.C. §§ 703 (authorizing actions for declaratory judgments).

17.    Venue in this District is proper pursuant to 28 U.S.C. § 1391 because the property

that is the subject of this action is located in this District.

### III.     PARTIES

18.     Plaintiff Tetra Tech EC, Inc. is an environmental construction company incorporated in Delaware, with its principal place of business in San Diego, California.

19.     Defendant United States Environmental Protection Agency is an agency in the executive branch of the federal government. Its principal office is at 1200 Pennsylvania Avenue, N.W., Washington, D.C. 20460. EPA is the federal agency with primary regulatory oversight over the Hunters Point environmental cleanup.

20.     Defendant Andrew R. Wheeler is named in his official capacity as Administrator of the EPA.

21.     Defendant United States Department of the Navy is a department in the Department of Defense. Its principal office is at 1000 Navy Pentagon, Washington, D.C. 20350. Plaintiff is informed and believes and on that basis states that the Navy owns Parcel G at Hunters Point in fee. The Navy is the lead agency responsible for the environmental investigation and cleanup at Hunters Point.

22.     Defendant Kenneth J. Braithwaite is named in his official capacity as the Secretary of the Navy.

23.     Any mandatory decree, as requested herein, must specify by name the federal officer(s) responsible. 5 U.S.C. § 702.

### IV.     STANDING

24.     Plaintiff TtEC is adversely affected by Defendants' preparation, approval, and implementation of the Final Parcel G Work Plan. The Final Parcel G Work Plan calls into question TtEC's prior work at Parcel G without any basis in the administrative record. Specifically, the Final Parcel G Work Plan states: "An independent third-party evaluation of previous data identified additional potential manipulation, falsification, and data quality issues with data collected at Parcel G (Navy, 2017, 2018). As a result, the Navy developed this work plan to investigate radiological sites in Parcel G." Final Parcel G Work Plan, Executive Summary, at III (emphasis added).

25.     No "independent, third-party evaluation" of TtEC's work at Parcel G has ever been officially released by the Navy, disseminated for public review and comment, or included in the administrative record for Hunters Point. Moreover, the draft report to which the Final Parcel G Work Plan refers found only "potential" issues with only a portion of TtEC's remediation data. Yet, the Final Parcel G Work Plan dictates that all remediation previously completed by TtEC at Parcel G must be redone.

26.     Plaintiff faces a real and immediate threat of injury to its financial interests from the approval and implementation of the Final Parcel G Work Plan. Despite lacking a rational basis for the extensive work to be conducted, the Navy has repeatedly indicated it intends to recoup the costs associated with the Final Parcel G Work Plan from TtEC.

27.     The Navy and the United States Department of Justice (DOJ) are in active litigation with TtEC, and therein have stated that the United States will recover the costs associated with the Final Parcel G Work Plan from TtEC, as follows:

A.     In a complaint filed against TtEC on July 15, 2019, pursuant to the False Claims Act, DOJ alleged that the United States' damages include the cost of re-testing TtEC's work at Hunters Point and the cost of agency coordination to effectuate the re-testing. *U.S. ex rel. Jahr, et al. v. Tetra Tech EC, Inc., et al.*, Case No. 13-cv-03835-JD (*Jahr*) (ECF No. 82), United States' First Amended Complaint in Intervention, at ¶¶ 91–92, 103.

B.     DOJ stated in a joint Case Management Conference statement filed in *Jahr* on June 6, 2019, that "[t]he United States estimates consequential damages to exceed $100,000,000. This number may increase as this case progresses." *Jahr* (ECF No. 73), Joint Case Management Conference Statement at 18.

28.     The Navy also submitted a victim impact statement in a criminal action filed against Justin Hubbard. *See* Letter from Laura Duchnak (Navy, Director of Base Realignment and Closure Program) to Judge Donato regarding Victim Impact Statement (March 15, 2018) in *United States of America v. Justin E. Hubbard,* Case No. CR-17-00278-JD (ECF No. 17), Exhibit A (Navy Statement). In advocating for a significant custodial sentence, the Navy estimated that

required site rework at Hunters Point would cost between $100,000,000 and $300,000,000. *Id.* at 3.

29.     Defendants' arbitrary and capricious actions and failure to follow applicable regulations in preparing and approving the Final Parcel G Work Plan has injured and will continue to injure TtEC. TtEC will suffer an injury in fact, which is concrete, particularized, actual, and imminent because the Navy seeks to recover its costs related to the Final Parcel G Work Plan from TtEC, even though Defendants' actions are arbitrary and not in accordance with the law.

30.     TtEC has an interest in ensuring that the responsible party, the Navy, bears the costs for cleaning up its own contamination, to the extent any contamination still exists.

31.     TtEC will benefit from a favorable ruling in this action because the United States will not be allowed to recover the unnecessary and excessive costs of preparing, approving, and implementing the unlawful Final Parcel G Work Plan from TtEC.

32.     Any person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action, is entitled to judicial review thereof. 5 U.S.C. § 702.

33.     This action is a justiciable controversy, ripe for consideration by this Court. The APA authorizes this Court to "hold unlawful and set aside agency action, findings, and conclusions" that violate the law or are otherwise "arbitrary and capricious." 5 U.S.C. § 706.

**V.     OVERVIEW OF THE FINAL PARCEL G WORK PLAN**

34.     Defendants claim that the purpose of the Final Parcel G Work Plan is to determine whether Parcel G was remediated in conformity with the Parcel G ROD. However, instead of conducting reasonable confirmatory sampling, Defendants' Final Parcel G Work Plan ensures a complete do-over of remediation at Parcel G, without considering the effectiveness of the current remedy or the costs and benefits of redoing the work.

35.     Defendants claim that the Final Parcel G Work Plan will prevent exposing "receptors" to levels of radionuclides of concern (ROCs) that exceed the remediation goals set by the Parcel G ROD. In contrast to this claimed objective, Defendants fashioned a methodology costing tens of millions of dollars that starts with removing Parcel G's durable cover, which was constructed as a remedial measure precisely to prevent any such exposure. Defendants plan to

destroy Parcel G's durable cover without assessing the cover's effectiveness in preventing exposure, the risks of destroying the cover, and without conducting a cost-benefit analysis, all of which are required by CERCLA.

36.     Defendants also plan to re-excavate previously backfilled trenches in Parcel G rather than collecting soil samples by drilling through the durable cover and extracting soil cores, a reasonable and less costly alternative. Further, Defendants will over-excavate the footprint of the prior trenches excavated by TtEC, unearthing previously untouched soils.

37.     Defendants have also changed the background levels of naturally occurring radionuclides to be used in sample comparisons, and in turn changed the remedial goals for two ROCs—all without documenting a need to do so, without considering risks, costs, or benefits, and without amending the Parcel G ROD or issuing an ESD, as CERCLA requires.

38.     The Final Parcel G Work Plan is the culmination of the government's arbitrary and capricious decision-making process that determines rights and obligations from which legal consequences will flow. Specifically, the Final Parcel G Work Plan provides the tasks and procedures for how the Navy will re-investigate and re-remediate Parcel G. The Final Parcel G Work Plan functionally mandates a complete do-over of the Parcel G investigation and remediation performed by TtEC. It is not tentative; it requires destruction of the existing durable cover, excavation, and sampling. Should the Navy now fail to implement the EPA-approved Final Parcel G Work Plan, it will be subject to the dispute resolution mechanisms outlined in Section 12 of the Federal Facility Agreement for Hunters Point.

39.     EPA approved the soil radiological retesting work under the Final Parcel G Work Plan on August 18, 2020.[1]

## VI.     STATUTORY AND REGULATORY FRAMEWORK

### A.     Administrative Procedure Act (APA)

40.     "A person suffering legal wrong because of agency action, or adversely affected or

_____

[1] Letter from John Chesnutt, EPA to Derek Robinson, Navy, *EPA Approval to Begin Parcel G Soil Radiological Retesting* (August 18, 2020).

aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Title 5 United States Code section 551(13) defines "'agency action' [to] include[] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."

41.     A "reviewing court shall … hold unlawful and set aside" agency action, findings, or conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706.

42.     An agency action is arbitrary and capricious when the agency relied on factors which Congress did not intend it to consider; "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference of view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). The "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

43.     Agency action that changes course or deviates from existing policy must be accompanied by a reasoned explanation for the change. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). A detailed justification for a change is generally required when a new course rests upon factual findings that contradict those underlying prior policy. *See F.C.C. v. Fox TV Stations, Inc.*, 556 U.S. 502, 515–16 (2009).

**B.     Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)**

44.     CERCLA, also known as Superfund, was enacted in 1980 to identify, investigate, and clean up hazardous waste sites.

45.     The primary purpose of CERCLA is to ensure the prompt and effective cleanup of waste disposal sites, and to ensure that parties responsible for environmental contamination bear the cost of remedying the hazardous conditions they create. *Carson Harbor Vill., Ltd. v. Unocal*

1    *Corp.*, 270 F.3d 863, 880 (9th Cir. 2001).

2        46.    CERCLA requires the use of science, risk assessment, cost-benefit analyses, and

3    institutional controls to develop remedial goals and plans. *See, e.g.*, 40 C.F.R. § 300.430.

4        47.    Implementing CERCLA's objectives requires coordinated efforts by many distinct

5    entities, including potentially responsible parties (here, the Navy), environmental regulators (such

6    as EPA), and remediation contractors (like TtEC).

7        48.    CERCLA recognizes the critical role remediation contractors play in carrying out

8    CERCLA's goals and contains provisions to ensure the fair and consistent treatment of

9    remediation contractors in the Superfund program. *See, e.g.*, 42 U.S.C. § 9619.

10                a.    <u>CERCLA Applies to Federal Facilities, Including Hunters Point</u>

11       49.    Federal agencies are subject to and required to comply with CERCLA, including

12   the liability provisions contained in CERCLA section 107, to the same extent as non-

13   governmental entities. 42 U.S.C. § 9620; 42 U.S.C. § 9607(g).

14       50.    Guidelines, rules, regulations, and criteria, including the NCP, apply to remedial

15   actions at Federal Facilities "in the same manner and to the extent as such guidelines, rules,

16   regulations, and criteria are applicable to other facilities." 42 U.S.C. § 9620(a)(2).

17       51.    The limitation on judicial review under CERCLA section 113(h) (42 U.S.C.

18   § 9613(h)) is not applicable to remedial actions undertaken at Federal Facilities under CERCLA

19   section 120 (42 U.S.C. § 9620), including the cleanup at Hunters Point. *Fort Ord Toxics Project,*

20   *Inc. v. California E.P.A.*, 189 F.3d 828, 834 (9th Cir. 1999).

21                b.    <u>The National Contingency Plan (NCP)</u>

22       52.    The NCP is the legislatively-mandated regulatory scheme under CERCLA that

23   addresses how the federal government responds to contaminated sites, including those listed on

24   the National Priorities List (NPL), otherwise known as Superfund sites.

25       53.    The purpose of the NCP, which was promulgated by EPA, is to ensure consistent,

26   risk-based, and cost-effective investigation and cleanup of sites listed under CERCLA. 40 C.F.R.

27   § 300.1, *et seq.* The NCP details the required procedures for responding to releases or potential

28   releases of hazardous substances.

54.     The NCP requires the lead agency to assemble and evaluate existing data from a site, including the results of any site inspections, preliminary assessments, removal actions, and the NPL listing process (40 C.F.R. § 300.430(b)), and then to use that information to develop a remedial investigation plan to characterize the nature of, and threat posed by, hazardous materials at a site. 40 C.F.R. § 300.430(b)–(d).

55.     The NCP requires the lead agency conducting a cleanup to adequately characterize the site, including, as appropriate, to "conduct field investigations, including treatability studies, and conduct a baseline risk assessment." 40 C.F.R. § 300.430(d)(1).

56.     Following the baseline risk assessment, the NCP requires the lead agency to consider the feasibility of remedial alternatives, and to consider cost, along with effectiveness and implementability, in assessing those alternatives. 40 C.F.R. § 300.430(e)(7)¬(9).

57.     Once the remedial investigation is complete, the remedy is selected and documented in a ROD. 40 C.F.R. § 300.430(f)((ii).

58.     Significant post-ROD changes to the remedy must be appropriately documented. 40 C.F.R. § 300.435(c)(2).

59.     CERCLA costs are not recoverable when inconsistent with the NCP. 42 U.S.C. § 9607(a)(4)(A); *Washington State Dept. of Transp. v. Washington Nat. Gas Co., Pacificorp*, 59 F.3d 793, 802 (9th Cir. 1995).

        c.     <u>EPA Superfund Guidance Documents</u>

60.     EPA publishes guidance documents to assist potentially responsible parties, consultants, remedial project managers, and EPA staff in assessing and documenting required remediation activities at Superfund sites. This guidance is instructive because it explains how EPA interprets applicable laws and oversees regulated parties conducting Superfund cleanups.

61.     EPA's "A Guide to Preparing Superfund Proposed Plans, Records of Decision, and Other Remedy Selection Decision Documents" details procedures and guidance for, *inter alia*, how and when to amend or document changes to a ROD. EPA 540-R-98-031, OSWER 9200.1-23P (July 1999) (EPA Remedy Selection Guidance).

62.     A federal agency must follow its own regulations, rules, and procedures. *United*

1   *States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954) *superseded by statute on other*

2   *grounds as stated in Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1961 (2020); *see*

3   *also Natl. Ass'n of Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003).

### VII.    FACTUAL ALLEGATIONS

**A.     History of the Hunters Point Naval Shipyard**

63.     Hunters Point is located on the shores of the San Francisco Bay in Southeast San Francisco. It comprises over 900 acres, approximately half of which are under water. The dry lands consist largely of fill materials moved from existing lands and hills in the area, or from other locations in and around the San Francisco Bay.

64.     The Navy operated a naval base at Hunters Point from approximately 1940 until the base was deactivated in or around 1974. In 1991, Hunters Point was placed on the Navy's Base Realignment and Closure (BRAC) list, and designated for closure.

65.     The Navy used radioactive materials at Hunters Point to support Naval operations, including in support of the World War II effort, and for research purposes at the Naval Radiological Defense Laboratory.

66.     In 2004, the Navy published the Hunters Point Shipyard Final Historical Radiological Assessment, History of the Use of General Radioactive Materials 1939–2003 (2004 HRA), which documents the history and use of radioactive materials and identifies potential areas of radiological contamination at Hunters Point.

67.     The Navy also contaminated soil, sediments, surface water, and groundwater at Hunters Point with petroleum fuels, pesticides, heavy metals, polychlorinated biphenyls, and/or volatile organic compounds. Hunters Point soils also contain naturally occurring radionuclides, asbestos, and metals.

68.     Hunters Point was added to the NPL on November 21, 1989. The Department of Defense is authorized to undertake CERCLA response actions by 10 U.S.C. § 2701 *et seq*. and Executive Order 12580. Hunters Point was slated for cleanup through the Navy's Installation Restoration Program, by which the Navy seeks to identify, investigate, and clean up contamination of hazardous materials at its bases throughout the country.

69.     EPA and the California Department of Toxic Substances Control (DTSC), on behalf of the State of California, oversee and enforce the Navy's cleanup. To that end, the Navy, EPA, and the State of California entered into a Federal Facility Agreement, effective January 22, 1992, which governs the cleanup of Hunters Point conducted under CERCLA section 120.[2]

70.     Pursuant to the Federal Facility Agreement, the Navy is the lead agency at Hunters Point and has jurisdiction over investigation and remediation of the site. EPA is the lead regulatory agency with oversight over the Navy's cleanup.

71.     The Navy's BRAC Program Management Office manages the cleanup at Hunters Point with assistance from the Navy's Radiological Affairs Support Office (RASO).

72.     To organize and facilitate the Superfund cleanup, the Navy divided Hunters Point into alpha-numeric parcels. Parcel G is located in the central portion of former Parcel D. *See* Parcel G ROD, Figure 2 (attached as Exhibit A).

**B.     Prior Parcel G Investigation and Remediation**

73.     As early as 1988, the Navy began investigating former Parcel D, which was later divided into Parcels D-1, D-2, G, and UC-1. *See* Parcel G ROD at Table 1; *see also* Exhibit A. Former Parcel D was part of the Naval Shipyard's industrial support area and was used for shipping, ship repair, and office and commercial space.

74.     The Navy used the Final Revised Feasibility Study Report for Parcel D (November 30, 2007), which includes a human health risk assessment, to assess Parcel G. The Final Radiological Addendum to the Final Revised Feasibility Study Report for Parcel D (April 11, 2008) contains the most recent radiological risk evaluation for former Parcel D, and provides the basis for the Parcel G ROD. This radiological risk evaluation assumed there was no durable cover constructed on Parcel G.

75.     The Navy finalized the Parcel G ROD on February 18, 2009. The ROD assessed chemical, radiological, and groundwater contamination at Parcel G, and documented the Navy's remedial decision making based on the risks assessed at that time. The remedy selected in the

---

[2] The Hunters Point Federal Facility Agreement is available here:
https://www.navfac.navy.mil/niris/SOUTHWEST/HUNTERS_POINT_NS/N00217_005218.PDF.

2009 Parcel G ROD included the construction of a durable cover to prevent exposure to underlying soil.

a.    TtEC's Work at Parcel G

76.    The Navy awarded contracts to TtEC to conduct radiological remediation and construction work at Hunters Point, including radiological investigations and remediation in Parcel G. TtEC was not responsible for remediating any chemical or metal contamination in Parcel G.

77.    The Navy chose to conduct a Time-Critical Removal Action (TCRA) to address potential radiological contamination of buildings, former building sites, storm drains, and sanitary sewers in Parcel G, which started before approval of the Parcel G ROD. The TCRA was one part of the overall remedy for Parcel G.

78.    TCRAs are used to reduce or prevent imminent and substantial threats to the public health, welfare, or the environment caused by a hazardous release at a property. A Final Basewide Radiological Removal Action Memorandum dated April 21, 2006 (2006 TCRA Memo) documented the TCRA under which TtEC investigated and remediated radiological contamination in Parcel G. Table 1 of the 2006 TCRA Memo lists the remedial goals (i.e., the cleanup standards) for radionuclides of concern at Hunters Point. Those remedial goals were incorporated into the Parcel G ROD. *See* Parcel G ROD at Table 5.

79.    During the TCRA, TtEC's work in Parcel G was to investigate and remediate specific locations potentially impacted by radiological contamination, as identified in the 2004 HRA.

80.    From 2007 through 2011, TtEC excavated, removed, and disposed of storm drain and sanitary sewer systems throughout Parcel G. TtEC excavated soil to a minimum depth of one foot below and on either side of the removed sewer lines. TtEC excavated and screened approximately 50,000 cubic yards of soil at Radiological Screening Yards (RSYs). The excavated trenches and the RSYs were divided into "survey units," and each survey unit was sampled at certain intervals across the unit. When samples were above the radiological remedial goals, soil in that area would be further sampled, delineated, and removed. TtEC identified thousands of cubic

yards of soil that exceeded radiological remedial goals and transferred that soil to the Navy's disposal contractor for offsite disposal. TtEC's work is documented in the Final Removal Action Completion Report for Parcel G, Hunters Point Naval Shipyard, San Francisco, California (December 2, 2011) (Parcel G RACR).

81.     During trench excavation and pipe removal in Parcel G, 63 unique trench survey unit identification numbers were assigned for tracking purposes, and for documenting Final Status Surveys (FSS). The FSS objective was to demonstrate that residual radionuclide levels in the excavated trenches and backfill did not exceed the TCRA remedial goals. TtEC documented survey results in the Survey Unit Project Reports (SUPRs) prepared for each of the 63 trench survey units.

82.     TtEC also completed radiological surveys at nine radiologically impacted areas identified in the 2004 HRA, including Buildings 351, 351A, 364, 365, 366, 401, 408, 411, and 439, and one former building site where three separate structures (Buildings 317, 364, and 365) were previously located. TtEC performed FSS surveys of the Parcel G buildings and former buildings sites, which demonstrated that residual radionuclide levels met the radionuclide-specific remedial goals, as documented in FSS reports.

83.     Navy RASO and BRAC, and regulatory agencies including EPA, DTSC, and the California Department of Public Health (CDPH), were responsible for monitoring and reviewing TtEC's work and performance at Hunters Point, including in Parcel G. Navy RASO personnel were often on-site at Hunters Point and were in frequent contact with TtEC to monitor the progress of TtEC's work. The Parcel G RACR documented the work performed by TtEC. The Navy and regulatory agencies reviewed the data and information provided in the Parcel G RACR and determined that remediation for radionuclides at Parcel G was successful and complete.

b.     Investigation of Anomalous Samples

84.     During the course of TtEC's work at Hunters Point, certain sampling results at an area outside of Parcel G (the former Building 517 area in Parcel E) showed lower than expected Potassium-40 levels. Potassium-40 is a naturally-occurring radionuclide present at various levels in soil and geological materials throughout Hunters Point and is not a radionuclide of concern.

After these anomalous sampling results were identified, TtEC conducted a comprehensive investigation, in close coordination with the Navy, to determine the cause of the anomalies. TtEC (1) carefully reviewed all survey units with samples that showed lower than expected Potassium-40 results in consultation with the Navy, (2) suspended or removed technicians associated with identified anomalous samples, (3) collected new samples to evaluate the anomalous samples, and (4) rejected all sample results that were not confirmed through analysis of the new samples.

85.     The Navy and TtEC did not make any investigation or remediation decisions based on any of the rejected samples identified during the investigation. Likewise, no regulatory agency, including EPA, based any remediation-related decisions on any rejected samples.

86.     The Navy was satisfied with TtEC's response to the anomalous samples and thereafter continued to issue contract task orders to TtEC for investigation and remediation of radiological contamination at Hunters Point.

87.     TtEC summarized the investigation in a report entitled "Investigation Conclusion Anomalous Soil Samples at Hunters Point Naval Shipyard," which TtEC finalized in April 2014.

88.     TtEC determined that the likely cause of the anomalous sample results was that certain individuals had not collected soil samples from the locations identified in chain-of-custody records.

89.     During and following the investigation, TtEC implemented multiple corrective actions to ensure the accuracy of all sampling. For example, TtEC developed procedures to immediately identify and escalate any atypical sample results and instituted additional training on sampling protocols and ethics. In addition, the Navy hired an independent consultant (Battelle) to provide surveillance and quality assurance for radiological work at Hunters Point. Navy Statement at 2.

90.     TtEC's investigation continued after the final 2014 report was submitted. With Navy input and oversight, TtEC continued to evaluate survey units and address all issues that arose during the course of the extended investigation to the satisfaction of the Navy.

91.     In total, TtEC identified 30 survey units (out of more than 900 total survey units) at Hunters Point that showed potentially anomalous data. TtEC, in close consultation with the Navy,

1   corrected all issues that were identified.

2         92.    None of the survey units with anomalous data were located in Parcel G.

3         93.    TtEC did not identify any additional anomalous sampling data following its

4   investigation and corrective actions.

5         94.    The Navy accepted TtEC's corrective actions and presented TtEC's final 2014

6   investigation report to the regulatory agencies, including EPA, in July 2014.

7         95.    In January 2017, the Navy confirmed it had accepted TtEC's investigation results in

8   a public fact sheet stating that after TtEC and the Navy had conducted their investigation and "the

9   new sampling and cleanup work was complete, independent analysis of the final data confirmed

10   that radiological contamination had, in fact, been cleaned up properly."

11        96.    In 2017, two former TtEC employees pleaded guilty to destruction, alteration, or

12   falsification of records in violation of 18 U.S.C. § 1519, for their role in the unauthorized

13   sampling. The specific locations identified in the plea agreements where the unlawful conduct

14   took place were addressed during TtEC's investigation and in the final 2014 investigation report.

15        97.    None of the specific locations where these two former rogue employees admitted to

16   altering or falsifying data are within the boundaries of Parcel G.

17   **C.    The Secret Tiger Team Process**

18        98.    In or around 2016, apparently in response to media reports and allegations made on

19   television by a former Hunters Point subcontractor, Anthony Smith, the Navy assembled a

20   Technical Team, known as the Hunters Point "Tiger Team," to further investigate TtEC's work at

21   Hunters Point. The Tiger Team decided to review all of the radiological data collected by TtEC at

22   Hunters Point since 2006. The Navy contracted with CH2M Hill, Inc. (CH2M) to conduct a

23   desktop evaluation of TtEC's radiological data.

24        99.    On December 13, 2016, the Tiger Team convened for a scoping meeting. Attendees

25   included Navy personnel and staff from several regulatory agencies, including EPA, CDPH,

26   DTSC, the San Francisco Department of Public Health, and the San Francisco Bay Regional

27   Water Quality Control Board. Also in attendance were CH2M personnel, other environmental

28   consultants, San Francisco Office of Community Investment and Infrastructure staff, and Mark

Luckhardt, then the Senior Project Manager for Five Point Holdings, LLC (Five Point), the private developer selected to redevelop Hunters Point, and the person at Five Point in charge of the Hunters Point redevelopment project.

100.    At this initial scoping meeting and throughout the Tiger Team process, EPA, led by Remedial Project Manager Lily Lee, advocated an unscientific approach to evaluating TtEC's data. EPA began with the premise that because former TtEC employees had admitted, and TtEC's investigation had discovered, that certain soil samples had been falsified, the Tiger Team could not say that *any* of TtEC's data were reliable—*even if* the statistical tests proposed by CH2M to evaluate those data *revealed no issues with the data*. EPA took this new approach despite the fact that the Navy in January 2017 had already certified that after "the new sampling and cleanup work was complete, independent analysis of the final data confirmed that radiological contamination had, in fact, been cleaned up properly." Thus, from the beginning, EPA pushed to throw out all of TtEC's data and force the Navy to completely redo the work at Hunters Point. EPA wanted to start over because it was being publicly accused of lax regulatory oversight at Hunters Point.

**D.    The Unscientific and Biased CH2M Draft Parcels B and G Report**

101.    The Navy pushed back on EPA's new position, arguing for data evaluation instead. Under intense pressure from EPA, CH2M—which is a competitor to TtEC—used unscientific analytical tools and methods to evaluate TtEC's data and conclude that approximately half of the Parcel G soil survey units sampled by TtEC showed signs of "potential data manipulation or falsification."

102.    CH2M shared its unscientific findings in the Draft Radiological Data Evaluation Findings Report for Parcels B and G Soil, Former Hunters Point Naval Shipyard, San Francisco, California, dated September 2017 (Draft Parcels B and G Report). This report was not finalized or officially released by the Navy, not disseminated for public review and comment, and not placed in the Hunters Point administrative record.

103.    The Draft Parcels B and G Report relies on incorrect underlying assumptions, applies arbitrary logic tests and inappropriate statistical tests to TtEC's data, relies on data graphs that are inaccurate and misrepresent the data, and reaches false and biased conclusions.

104.    At every juncture, the Draft Parcels B and G Report assumes, without evidence, that any and all variability in the data was caused by malfeasance. It ignores documented, scientific explanations for data variability, and instead blindly assumes misconduct by site workers.

105.    The result of this biased and flawed methodology is a report that aims to support EPA's predetermined conclusion that TtEC's work is tainted. CH2M's unscientific evaluation of the data led the Navy to erroneously conclude that a large portion of TtEC's Parcel G data is unreliable.

106.    Defendants then used this invalid conclusion from the Draft Parcels B and G Report to justify the work outlined in the Final Parcel G Work Plan. *See* Final Parcel G Work Plan, Executive Summary, at III ("An independent third-party evaluation of previous data identified additional potential manipulation, falsification, and data quality issues with data collected at Parcel G (Navy, 2017, 2018)."). Yet, Defendants failed to place the Draft Parcels B and G Report in the Hunters Point administrative record.

107.    Capitalizing on its unsubstantiated conclusions about TtEC's remediation work, CH2M then contracted to complete the site rework purportedly necessitated by its own evaluation of TtEC's data—a clear conflict of interest that Defendants simply ignored. CH2M was thus incentivized to find as many problems with TtEC's data as possible, whether or not problems actually existed. The more data CH2M could question, the more confirmation fieldwork would be required, and the more profit CH2M would secure in the future.

108.    The meeting notes from the secretive Tiger Team process document how CH2M's flawed Draft Parcels B and G Report was massaged, manipulated, and revised to achieve EPA's desired outcome. However, even the biased CH2M report could not fully justify EPA's chosen result.

**E.     EPA's Selective and Biased Data Evaluation**

109.    Even though CH2M's flawed evaluation cast unfounded suspicion on data from almost half of the Parcel G survey units, EPA went even further to cast suspicion on data throughout Parcel G by second-guessing only the data from the survey units that CH2M had found

required "No Further Action" (NFA). In other words, EPA blindly accepted CH2M and the Navy's findings of data problems, but disagreed with CH2M and the Navy nearly every time the data were deemed reliable. Thus, EPA accepted CH2M's findings wholesale when those findings served EPA's goal of a complete do-over, but rejected CH2M's findings when they did not—the epitome of an outcome-driven, biased approach.

110.     EPA's cherry-picking of CH2M's data evaluation led to EPA concluding that 97% of survey units in Parcel G required further investigation.[3] EPA's biased methodology was designed to conclude that all survey units had to be fully resampled, thus aligning with the preordained outcome that EPA had announced during the December 2016 Tiger Team scoping meeting, prior to CH2M and the Navy conducting any evaluation whatsoever of TtEC's data.

111.     EPA's flawed review utilized many of the same (albeit faulty) assumptions and methods that CH2M had used, but even though EPA and CH2M were evaluating the same data for the same reason, EPA found twice as many "suspect" results.

112.     EPA, like CH2M, ignored well-documented soil variability at Hunters Point. EPA incorrectly assumed that changes in naturally occurring radioactive materials (NORM) were a sign of data falsification, when in fact, such changes are consistent with the highly variable soils on-site. NORM is ubiquitous and present to varying degrees in nearly all soil. In fact, the Navy's own effort to re-characterize background radionuclide (i.e., NORM) levels in 2019 during the Background Soil Study clearly illustrates this point. The Navy's Background Soil Study found the same variability in NORM in 2019 that EPA used as evidence of potential data falsification in TtEC's data.

113.     If EPA applied the same criteria to the data collected under its close supervision during the 2019 Background Soil Study that it applied to TtEC's data, EPA would be forced to conclude that the Navy's 2019 Background Soil Study data are suspect because they show the

---

[3] *See* Letter from John Chesnutt, Manager Pacific Islands and Federal Facilities Section, Superfund Division, EPA to George Brooks, Navy, enclosing *EPA Review of Draft Radiological Data Evaluation Findings Report for Parcels B and G Soil, Former Hunters Point Naval Shipyard, San Francisco, California, September 2017* (Dec. 27, 2017).

1  same "signs of falsification" that EPA claims is present in TtEC's data.

2       114.    EPA concocted additional arbitrary and non-diagnostic assumptions to deploy as

3  further "signs of falsification." For example, EPA flagged certain samples because the reported

4  mass differed in samples between the on- and off-site labs. This demonstrates a fundamental lack

5  of understanding of the sample collection and transfer process at Hunters Point. Sample collection

6  containers varied, and sometimes required repackaging at the laboratory prior to analysis, in which

7  case mass would be expected to change. Additionally, the water content of some samples was

8  reduced between analyses due to drying in the laboratory, again resulting in an expected change in

9  mass. All sample preparation and transfer steps must be understood to interpret the sample mass

10  reported by a laboratory. Absent such an understanding, any conclusion derived from sample

11  weight values is speculative and unscientific, like EPA's here.

12       115.    Even the Tiger Team realized the arbitrary nature of EPA's so-called data review

13  while it was in progress, and in October 2017 discussed that the "identification of potential

14  falsification need [*sic*] to be demonstrated and stand up in court," which EPA agreed to take into

15  account when fashioning its public comments. HPNS Technical Team Meeting Agenda Notes

16  (Oct. 17, 2017), at 1.

17  **F.    The Conception and Preparation of the Unlawful Final Parcel G Work Plan**

18       116.    In September 2017, the Tiger Team concluded—at EPA's behest—that it would

19  shift from evaluating TtEC's radiological data (under the Navy's contract with CH2M) and instead

20  focus on collecting new radiological data throughout Hunters Point.

21       117.    In October 2017, the Tiger Team discussed resampling throughout Parcel G

22  because the Tiger Team thought that "Parcel G was likely subject to falsification based on

23  timing…." HPNS Technical Team Meeting Agenda Notes (Oct. 17, 2017), at 1. Apparently, the

24  Tiger Team mistakenly believed that TtEC's Parcel G work had occurred around the same time as

25  the investigated anomalous sampling had occurred. In fact, TtEC's remediation work in Parcel G,

26  with the sole exception of work at trench unit 204, took place between 2007 and 2009. *See* Parcel

27  G RACR at Table 3-3. In contrast, the unauthorized soil sampling identified during TtEC and the

28  Navy's investigation, and the admitted sample record falsification by two former TtEC employees,

1   occurred in 2011 and 2012.

2       118.    The Navy noted during a subsequent Tiger Team meeting that shifting the

3   "objective from identifying potential data falsification to re-evaluating the parcel [was] a large

4   undertaking (~$200M and ~4 years) to redo all TtEC's work." HPNS Technical Team Meeting

5   Agenda Notes (Nov. 7, 2017), at 2. Notwithstanding this explicit lament, the Navy failed to do a

6   cost-benefit analysis as required by the NCP. 40 C.F.R. § 300.430(e)(7)(iii).

7       119.    In March 2018, EPA announced that if the Navy did not conduct a complete do-

8   over at Parcel G, EPA would not approve transfers of parcels to the City of San Francisco for

9   redevelopment, meaning the Navy would be stuck with Hunters Point indefinitely.[4] EPA's demand

10  was improperly based on unproven, disputed allegations by disgruntled former subcontractors and

11  CH2M and EPA's biased data reviews. *Id*. at Attachment 1.1 at pp. 1, 3, 4. EPA concluded "that

12  the previous data is unusable" and required the Navy to completely redo all radiological

13  remediation work at Parcel G. *Id*. at Attachment 1.1 at p. 1. The Navy rolled over and began

14  writing the Draft Parcel G Work Plan.

15      120.    EPA was so zealously committed to forcing the Navy to redo TtEC's work, it

16  encouraged the Navy to recast the allegations against TtEC as "fact." At the September 18, 2018

17  Tiger Team meeting, the Navy walked through EPA's comments on the Draft Parcel G Work Plan

18  and specifically called out EPA's insistence that:

19          "Various locations in the text where allegations of potential data
            manipulation and falsification are referenced should now be stated
20          as fact."

21  HPNS Technical Team Meeting Agenda Notes (Sept. 18, 2018), at 2. Clearly uncomfortable with

22  EPA's direction to state unproven allegations as facts, the Navy stated that "the language will be

23  updated in consultation with Navy legal since all of the allegations have not been confirmed." *Id*.

24      121.    The Tiger Team realized early on that the Parcel G rework posed potential

25

26  _____

27  [4] Letter from John Chesnutt, Manager Pacific Islands and Federal Facilities Section, Superfund
    Division, EPA, to Laura Duchnak, Navy, enclosing *EPA Comments on Draft Work Plan*
28  *Radiological Survey and Sampling, Former Hunters Point Naval Shipyard, San Francisco,
    California*, February 2018 (March 26, 2018) (March 2018 EPA Comments), at 1.

challenges for CERCLA compliance, because EPA's approach required setting new background levels for ROCs, which would impact remedial goals. EPA's approach also required a significant and unjustified change in cost and required destroying the durable cover to re-excavate the filled-in trenches. So, the Navy started to evaluate "CERCLA paths," including "a ROD amendment (or post-ROD change) . . . ." HPNS Technical Team Meeting Agenda Notes (April 17, 2018), at 1.

122.    The Navy was right to be concerned. The Final Parcel G Work Plan in fact requires fundamental changes to the Parcel G remedy, including changing remedial goals. Thus, a ROD amendment is required. A ROD amendment is required when a fundamental change is made to the basic features of the remedy selected in a ROD. 40 C.F.R. § 300.435(c)(2)(ii); *see also* EPA Remedy Selection Guidance, at 7-5 ("When a fundamental change is made to the basic features of the remedy selected in a ROD with respect to scope, performance, or cost, the lead agency is required to develop and document the change consistent with the ROD process"). Fundamental changes "involve an appreciable change" in scope, performance, and/or cost. *See* EPA Remedy Selection Guidance, at 7-2. Here, no ROD amendment was prepared, even though the Final Parcel G Work Plan caused an appreciable change in the scope, performance, and cost of the remedy.

123.    If the changes to the remedy for Parcel G are considered significant, rather than fundamental, an ESD is required under the NCP and EPA's guidance documents. An ESD is required when a remedial action "differs significantly from the remedy selected in the ROD, with respect to scope, performance, or cost[.]" 40 C.F.R. § 300.435(c)(2)(i); *see also* EPA Remedy Selection Guidance, Chapter 7, at 7-2. Any such ESD must be also added to the administrative record. 40 C.F.R. § 300.825(a)(2). Significant changes to a remedy include large increases in cost and new cleanup levels. *See* EPA Remedy Selection Guidance, Highlight 7-1: Examples of Post-Record of Decision Changes, at 7-3. Here, no ESD was prepared.

124.    In June 2018, the Navy circulated the Draft Parcel G Work Plan to regulators and the public for comment. At a Tiger Team meeting shortly thereafter, EPA insisted that if only *one* sample collected at Parcel G exceeded *one* remedial goal, 100 percent of the Parcel G trenches would have to be re-excavated. HPNS Technical Team Meeting Agenda Notes (Jun. 19, 2018), at 1. EPA complained that the Navy's draft plan omitted this "requirement." *Id.*

125.     During a meeting in October 2018, EPA acknowledged that its single-sample failure rule did not follow the Multi-Agency Radiation Survey and Site Investigation Manual (MARSSIM),[5] but rather was based on its desire to improve public perception. The Navy asserted that because MARSSIM was used to calculate the number of samples to be taken, MARSSIM should be used to demonstrate compliance with the remedial goals. In particular, the Navy was concerned that the approach EPA proposed for Hunters Point should not become precedent for other sites. EPA replied that it was employing this approach at Hunters Point because, EPA said, it "provides a positive message." HPNS Technical Team Meeting Agenda Notes (Oct. 16, 2018), at 3.

126.     In the nearly four years during which Defendants worked on the Parcel G Work Plan (from December 2016 to August 2020), the Navy gave TtEC and the public *only sixty days* to comment on the proposed plan (from June 15 to August 14, 2018).

127.     Despite Defendants' attempts to keep the public largely out of the development of the Parcel G Work Plan, TtEC submitted comments that identified the flaws described herein to the Navy. TtEC submitted comments on both the Draft Parcel G Work Plan (June 2018) and the Draft Final Parcel G Work Plan (November 2018). The Navy also received other critical comments from other interested parties. The Navy and EPA were on notice of the problems with the Final Parcel G Work Plan, yet they proceeded nonetheless.

**G.     The 2019 Background Soil Study and Report**

128.     Because soil at Hunters Point contains NORM, the baseline level of background radionuclides must be determined in order to set remedial goals for soil samples.

129.     An important principle when remediating any radiologically impacted site is that background, or naturally occurring, levels of radionuclides should not be remediated. The remedial goals are designed to clean up the radionuclides *in excess* of the naturally occurring levels, but not to clean up NORM. Remediation should only take place where excess risk is

---

[5] MARSSIM was developed by EPA, the Department of Defense, the Department of Energy, and the Nuclear Regulatory Commission to provide a standardized approach to demonstrating compliance with radiological dose- or risk-based regulations.

greater than the protective threshold specified in the NCP, with excess risk based on exposure to radionuclide concentrations *above* background levels. For instance, at Hunters Point, the remedial goal for radium-226 is defined as the risk-based criteria (1 pCi/g) plus the background concentration. Parcel G ROD at Table 5.

130.     During the August 7, 2018 Tiger Team meeting, the Navy raised concerns about "cleaning up background and NORM." The Navy was well aware that during TtEC's prior remediation work, remedial goals were set very close to background levels, which often led to unnecessary remediation. This was acknowledged in the Draft Parcel G Work Plan (June 2018), which stated "[t]he RGs [remedial goals] used previously [by TtEC] are within background ranges. Therefore, soil that was considered contaminated could have been attributable to naturally occurring radioactivity or anthropogenic fallout (Argonne National Laboratory, 2011)." Draft Parcel G Work Plan, Executive Summary, at IV. This language disappeared from later versions of the Parcel G Work Plan, including the Draft Final Parcel G Work Plan (November 2018) and the Final Parcel G Work Plan (June 2019).

131.     Defendants certainly did not want to get stuck cleaning up NORM like TtEC had, so they designed a Background Soil Study to investigate and establish higher background levels.

132.     As a result of the Background Soil Study, the remedial goal for cesium-137 changed. The change of the cesium-137 remedial goal is a fundamental change because it has resulted and will result in a substantial increase in scope, cost, and overall approach to the remedy, and therefore it requires a ROD amendment. At minimum, the remedial goal change is significant and requires an ESD. Defendants' failure to appropriately document this change violates the NCP and EPA's guidance documents.

133.     As a result of the Background Soil Study, the background level for radium-226 also changed. Thus, the remedial goal for radium-226 changed, because the remedial goal for radium-226 is 1 pCi/g plus the background concentration. This change will affect the scope and cost of the remedy as well.

134.     Despite these changes to the remedial goals, Defendants failed to prepare a ROD amendment or an ESD, in violation of the APA and CERCLA. Defendants' decision making is

1    arbitrary, capricious, and not in accordance with the law.

2    **H.      The Flawed Parcel G Soil Sampling Plan**

3        135.    In August 2020, EPA approved the soil sampling plan in the Final Parcel G Work

4    Plan. The sampling plan is flawed and designed to lead to the re-excavation of 100 percent of the

5    trenches in Parcel G. Re-excavation of all Parcel G trenches is inevitable, because a single

6    exceedance in one sample of one remedial goal for one ROC will trigger a complete re-excavation,

7    and given EPA's approach, a single exceedance is guaranteed.

8        136.    The Final Parcel G Work Plan is divided into two phases. In Phase I, 33 percent of

9    the survey units (21 of 63 total survey units) in Parcel G will be completely re-excavated,

10   sampled, and characterized. Final Parcel G Work Plan, Appendix B, Sampling and Analysis Plan

11   (Parcel G SAP), at 6. The 21 survey units selected for Phase I were not randomly selected but

12   actually targeted based on the likelihood of contamination. *Id.*

13       137.    Regardless of the outcome of Phase 1, Phase 2 will proceed, with sampling in the

14   remaining 42 survey units. The results of Phase 1 will determine only *how* the work will be done

15   during Phase 2—re-excavation of trenches versus borings into trench areas. Re-excavation of 100

16   percent of Phase 2 survey units will occur if even one sample exceeds any remedial goal during

17   Phase 1. Parcel G SAP, at 6.

18       138.    The probability that at least one sample in Phase 1 will fail to meet a remedial goal

19   by chance alone, is 99.9999999998 percent—essentially, a 100 percent probability of failure.[6]

20   Therefore, there is 100 percent certainty that all of the Parcel G trenches will be re-excavated and

21   all of the soil investigation and remediation at Parcel G will be re-done.

22       139.    In addition, the Navy intends to *over-excavate* the trench survey units previously

23   excavated by TtEC by at least 6 inches in all directions. Final Parcel G Work Plan, at 3-2, 3-8.

24   _____

25   [6] This is because the Final Parcel G Work Plan does not call for taking one sample at each of the
     21 survey units as would be expected. Instead, the Navy plans to take at least 25 samples in each
26   of the 21 survey units. *See* Final Parcel G Work Plan at 3-7. The Navy then plans to test each of
     the 25 samples in the 21 survey units for at least 3 ROCs. *Id.* The result is that the Navy will test at
27   least 25 samples x 21 survey units x 3 ROCs for a total of 1,575 actual comparisons of samples to
     the RGs. If any one test reveals any ROC above the RG, that single failure means the entirety of
28   Parcel G must be re-excavated and re-remediated.

1    Thus, the Navy will be investigating new soil—soil that TtEC was never required to excavate,

2    sample, or remediate—to ostensibly evaluate whether TtEC failed to remediate that soil. This

3    approach is nonsensical, arbitrary, and unfair.

4       140.    By designing the sampling plan in this manner, EPA's preordained outcome of a

5    complete redo of the Parcel G remediation work is guaranteed.

6       141.    Needless to say, the Phase 1 and 2 excavation and sampling requires destruction of

7    the durable cover currently in place in Parcel G. *See* Final Parcel G Work Plan, at 3-5. Yet, neither

8    the Navy nor EPA considered the health and safety effects of the durable cover, or the risks

9    associated with its destruction.

10    <u>**CLAIMS FOR RELIEF – 5 U.S.C. § 706**</u>

11    <u>**FIRST CLAIM FOR RELIEF**</u>

12    **THE NAVY'S CHANGE IN POSITION FROM DATA APPROVAL AND EVALUATION,**
      **TO COMPLETELY RE-EXCAVATING PARCEL G, IS ARBITRARY AND**
13    **CAPRICIOUS.**

14    <u>**(Against the Navy and the Secretary of the Navy)**</u>

15       142.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs above as

16    though set forth fully herein.

17       143.    For years after the anomalous soil sample results were discovered in 2012, and

18    thoroughly investigated thereafter, the Navy publicly defended TtEC's radiological work,

19    repeatedly stating that the work was conducted properly, as confirmed by the TtEC and Navy

20    investigation. TtEC submitted multiple reports to the Navy describing the investigation and

21    corrective actions, which the Navy accepted and discussed with federal, state, and local

22    environmental regulatory agencies. The Navy's independent quality assurance contractor did not

23    identify any further quality or sampling issues. The Navy continued to award TtEC additional

24    work at Hunters Point for many years after the investigation concluded. The Navy's statements and

25    actions show that the Navy had found that the isolated sampling anomalies were satisfactorily

26    resolved.

27       144.    Ignoring its own prior findings, the Navy then arbitrarily and capriciously changed

28    its position in response to public pressure and threats from EPA, acquiescing to the complete do-

1    over of Parcel G's radiological remediation.

2          145.    The Navy changed its position to accede to EPA's demands even though its prior

3    findings, and even CH2M's more recent draft findings, contradicted EPA's approach.

4          146.    An agency modifying its position must articulate a reasoned explanation for the

5    change. *Encino,* 136 S. Ct. at 2125. The Navy has not articulated a reasoned explanation for its

6    changed position concerning the remediation previously conducted by TtEC at Parcel G. Nor has

7    the Navy reasonably explained its decision to shift from evaluating TtEC's data to re-excavating

8    and re-remediating Parcel G in its entirety.

9          147.    The Navy's failure to support its change in position with a reasoned explanation

10   renders it arbitrary and capricious.

11                         **SECOND CLAIM FOR RELIEF**

12   **THE NAVY AND EPA'S RELIANCE ON UNPROVEN ALLEGATIONS AND DRAFT**
     **DOCUMENTS NOT IN THE ADMINISTRATIVE RECORD IS ARBITRARY AND**
13                **CAPRICIOUS AND CONTRARY TO LAW.**

14                           **(Against All Defendants)**

15         148.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs above as

16   though set forth fully herein.

17   **A.     The Navy's Reliance on the Draft Parcels B and G Report as the Basis for the**
     **       Remedial Actions in the Final Parcel G Work Plan Is Contrary to Law.**
18

19         149.    The Navy relied on CH2M's draft evaluation of TtEC's radiological remediation

20   data in preparing the Final Parcel G Work Plan.

21         150.    CH2M's draft evaluation of TtEC's radiological remediation data was never

22   officially released by the Navy, never disseminated for public review and comment, and never

23   made part of the administrative record for Hunters Point.

24         151.    The NCP requires that "all documents that form the basis for the decision to modify

25   the response action shall be added to the administrative record file[]" when a remedial decision is

26   modified, and a ROD amendment or ESD is required. 40 C.F.R. § 300.825(a)(2).

27         152.    The Navy's reliance on the CH2M draft evaluation as the basis for modifying the

28   remedial actions at Parcel G, as explicitly stated in the Final Parcel G Work Plan, without adding

1   the underlying evaluation document to the administrative record, is not in accordance with the law.

2   **B.      EPA Improperly Relied on Unproven Allegations and Its Own Data Review to Justify**
    **Its Decision Concerning Parcel G.**

3

4          153.    EPA relied on unproven, disputed allegations by disgruntled former subcontractors

5   to conclude that TtEC's prior "sampling of trench soils is unreliable." *See* March 2018 EPA

6   Comments, Attachment 1.1 at p. 1. Based on these disputed allegations, EPA concluded "that the

7   previous data is unusable" and required the Navy to completely redo all radiological remediation

8   work at Parcel G. March 2018 EPA Comments, at 1.

9          154.    EPA's decision to rely on unfounded claims, which are not part of the

10  administrative record for Hunters Point, violates the NCP (40 C.F.R. § 300.825(a)(2)), and its own

11  guidance documents. *See* EPA Remedy Selection Guidance, at 7-1 (when new information

12  substantially supports the need to significantly alter the response action "the lead agency must

13  consider and respond to this information and place such comments and responses in the

14  Administrative Record file.")

15         155.    In its own data review, EPA alleged, without proof or detail, that there was a

16  "general failure to follow Work Plans by the previous contractor"—meaning, TtEC. March 2018

17  EPA Comments, at Attachment 1.1 at p. 1.

18         156.    EPA's reliance on non-specific, unfounded, and unverified allegations and its own

19  biased data review, none of which are in the administrative record for Hunters Point, violates the

20  APA.

21                              <u>**THIRD CLAIM FOR RELIEF**</u>

22       **THE NAVY'S FAILURE TO CONDUCT A RISK ASSESSMENT OF CURRENT**
         **CONDITIONS AT PARCEL G, AND EPA'S APPROVAL OF THE FINAL PARCEL G**
23       **WORK PLAN ABSENT A RISK ASSESSMENT, ARE ARBITRARY AND CAPRICIOUS**
                              **AND CONTRARY TO LAW.**
24
                              (<u>**Against All Defendants**</u>)
25

26         157.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs above as

27  though set forth fully herein.

28  / / /

**A.     The Navy's Failure to Conduct a Risk Assessment That Considers the Durable Cover, and EPA's Approval of the Final Parcel G Work Plan Without That Assessment, Are Arbitrary and Capricious.**

158.     The NCP requires the lead agency conducting a cleanup to conduct a remedial investigation to adequately characterize the site. 40 C.F.R. § 300.430(d)(1). To do so, "the lead agency shall, as appropriate, conduct field investigations, including treatability studies, and conduct a baseline risk assessment." *Id.*

159.     The NCP further requires the lead agency to assemble and evaluate existing data on the site, including the results of any removal actions, remedial preliminary assessment and site inspections, and the NPL listing process. 40 C.F.R. § 300.430(b). The lead agency must use that information to develop a remedial investigation plan to characterize the nature of and threat posed by hazardous materials at the site. 40 C.F.R. § 300.430(b)–(d).

160.     The Navy failed to conduct a baseline risk assessment for Parcel G that assessed current site conditions. Prior investigations and assessments used to support the 2009 Parcel G ROD cannot be used to support the Final Parcel G Work Plan because current site conditions are substantially different than in 2009. Specifically, Parcel G trenches were excavated, soil was removed from the site, additional soil was remediated, and the entire parcel was capped with a durable cover, in accordance with the Parcel G ROD selected remedy. *See* Final Fourth Five-Year Review, Hunters Point Naval Shipyard, San Francisco, CA (July 2019), at 3-32–3-35.

161.     The Parcel G ROD was prepared prior to completion of radiological investigations and remediation, and prior to construction of the durable cover. *See* Parcel G ROD, at 14.

162.     The Navy and EPA now intend to destroy the durable cover and re-excavate Parcel G without conducting a risk assessment of the current site conditions with the durable cover in place.

163.     The Navy's implementation of the Final Parcel G Work Plan without a baseline risk assessment that includes the effect of the durable cover is unscientific and unsound, violates the NCP (40 C.F.R. § 300.430(b)–(d)), and is arbitrary and capricious and not in accordance with the law.

164.     EPA's approval of the Final Parcel G Work Plan absent such a baseline risk

1    assessment is likewise arbitrary and capricious and not in accordance with the law.

2    **B.    The Navy's Failure to Consider the Risks Associated with Destruction of the Durable**
     **Cover, and EPA's Approval of the Destruction Absent that Consideration, Are**
3    **Arbitrary and Capricious.**

4        165.    Destroying the durable cover will create potential exposure pathways for any

5    radionuclides, metals, and chemicals that remain in the underlying soil, notwithstanding EPA's

6    stated insistence that all exposure pathways need to be eliminated. The very process EPA has

7    forced on the Navy creates exactly the potential danger about which EPA claims to be concerned.

8        166.    The Navy has not considered the risks associated with destruction of the Parcel G

9    durable cover.

10       167.    The Navy's decision to destroy the durable cover is therefore arbitrary and

11   capricious.

12       168.    EPA's approval of the Final Parcel G Work Plan, which mandates the destruction of

13   the durable cover, absent adequate consideration of the associated risks, is likewise arbitrary and

14   capricious.

15                             **FOURTH CLAIM FOR RELIEF**

16       **THE NAVY'S FAILURE TO ADEQUATELY CONSIDER AND DOCUMENT THE**
         **INCREASED COSTS OF THE FINAL PARCEL G WORK PLAN, AND EPA'S**
17       **APPROVAL OF THE WORK PLAN WITHOUT ANALYZING THE INCREASED**
         **COSTS, ARE ARBITRARY AND CAPRICIOUS AND CONTRARY TO LAW.**
18
                             **(Against All Defendants)**
19

20       169.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs above as

21   though set forth fully herein.

22       170.    The costs for implementing the Final Parcel G Work Plan are estimated to exceed

23   $30,000,000. These costs are in addition to those already identified in the Parcel G ROD.

24       171.    The NCP requires the lead agency to consider cost, along with effectiveness and

25   implementability, in assessing remedial alternatives. 40 C.F.R. § 300.430(e)(7).

26       172.    The Navy will incur the costs of the Final Parcel G Work Plan, despite the fact that

27   neither EPA nor the Navy conducted a cost-benefit analysis.

28       173.    The Navy and EPA did not adequately consider other alternatives to large-scale

excavation at the site, including less intrusive, less expensive confirmatory sampling methods to verify the results of the prior remediation at Parcel G.

174. The costs of the large-scale excavation and remediation planned at Parcel G are "grossly excessive compared to the overall effectiveness." 40 C.F.R. § 300.430(e)((7)(iii).

175. Similarly, the Navy has not adequately considered whether destruction of the durable cover is necessary, or conducted an analysis of the costs, in violation of the NCP.

176. EPA's approval of the Final Parcel G Work Plan, which mandates the destruction of the durable cover, absent adequate consideration of the necessity and cost of doing so, is arbitrary and capricious.

177. Defendants' new remedial plan for Parcel G is arbitrary and capricious because it will result in excess costs that can reasonably be avoided and because the enormous costs of the Parcel G rework have not been properly analyzed.

**FIFTH CLAIM FOR RELIEF**

**THE NAVY'S FAILURE TO AMEND THE PARCEL G ROD OR ISSUE AN ESD, AND EPA'S FAILURE TO REQUIRE SUCH ROD AMENDMENT OR ESD, ARE ARBITRARY AND CAPRICIOUS.**

**(Against All Defendants)**

178. Plaintiff re-alleges and incorporates by reference the preceding paragraphs above as though set forth fully herein.

179. The Navy's remedial plan, as set forth in the Final Parcel G Work Plan, differs significantly from the selected remedy in the 2009 Parcel G ROD, but the Navy has not amended the ROD, or issued an ESD, as required by the NCP.

180. The NCP requires that "[a]fter the adoption of the ROD, if the remedial action or enforcement action taken, or the settlement or consent decree entered into, differs significantly from the remedy selected in the ROD with respect to scope, performance, or cost, the lead agency shall consult with the support agency, as appropriate, and shall either: (i) [p]ublish an explanation of significant differences when the differences in the remedial or enforcement action, settlement, or consent decree significantly change but do not fundamentally alter the remedy selected in the ROD with respect to scope, performance, or cost....[or] (ii) [p]ropose an amendment to the ROD

1    if the differences in the remedial or enforcement action, settlement, or consent decree

2    fundamentally alter the basic features of the selected remedy with respect to scope, performance,

3    or cost." 40 C.F.R. § 300.435(c)(2).

4            181.    The Parcel G Work Plan differs fundamentally and significantly from the remedy

5    set forth in the Parcel G ROD, in the following ways:

6            a.    The Navy and EPA collected new soil samples to determine new

7    background levels for the ROCs. This resulted in higher background levels for cesium-137 and

8    radium-226 than those used during previous remediation activities.[7]

9            b.    The new background levels required changing the remedial goal for cesium-

10   137, which is now higher than the remedial goal specified in the ROD. *Compare* Background

11   Report Table 7-1 *and* Table 7-2. Yet, the Navy did not document this remedial goal change in

12   either a ROD amendment or an ESD, despite the increased scope of work and the increased costs

13   associated with altering this fundamental component of the remedy.

14           c.    The remedial goal for radium-226 also changed, because it is set according

15   to the background level for radium-226, which increased based on the 2019 Background Soil

16   Study. *Id.* Defendants did not document this change in a ROD amendment or an ESD.

17           d.    Due to the rework required by the Final Parcel G Work Plan, the cost of the

18   remedy has increased significantly over the already-completed remedy selected in the ROD, yet

19   neither the Navy nor EPA have analyzed these increased costs, let alone justified them.

20           e.    The durable cover, a key component of the selected remedy, is being

21   destroyed.

22           182.    Despite these significant changes to the remedy selected in the ROD, the Navy has

23   not issued an ESD or amended the ROD as required by CERCLA and the NCP.

24           183.    The decision not to issue or require a ROD amendment is contrary to EPA's own

25   guidance, which requires that "fundamental changes" to the remedy selected in the ROD,

26   _____

27   [7] Final Background Soil Study Report, Base Realignment and Closure Program Management
     Office West, Former Hunters Point Naval Shipyard, San Francisco, California (June 2020)
28   (Background Report), at 7-1–7-3.

including those that involve "an appreciable change or changes in the scope, performance, and/or cost" or "a number of significant changes that together have the effect of a fundamental change," be documented in a ROD amendment. *See* EPA Remedy Selection Guidance, at 7-2–7-4.

184.    The decision not to issue or require an ESD is contrary to EPA's own guidance, which requires that "significant changes" to the remedy selected in the ROD, including large increases in cost or new cleanup levels, require an ESD. *See* EPA Remedy Selection Guidance, Highlight 7-1: Examples of Post-Record of Decision Changes, at 7-3.

185.    The Navy's failure to issue a ROD amendment or an ESD, and EPA's failure to require a ROD amendment or an ESD, are arbitrary and capricious and not in accordance with the law.

186.    The Navy and EPA acted arbitrarily and capriciously and violated CERCLA and the NCP. Thus, the costs associated with the preparation, approval, and implementation of the Final Parcel G Work Plan are inconsistent with CERCLA, and are not recoverable costs.

## **REQUEST FOR RELIEF**

WHEREFORE, TtEC respectfully requests that this Court enter a judgment and order, as follows:

1.    Declaring that the Final Parcel G Work Plan is arbitrary, capricious, and not in accordance with the law;

2.    Declaring that any costs associated with the preparation, approval, and implementation of the Final Parcel G Work Plan are not recoverable from TtEC;

3.    Awarding TtEC its reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this action, under the Equal Access to Justice Act, codified at Title 28, United States Code, section 2412(d); and

4.    Awarding TtEC such additional and further relief as this Court may deem just, proper, and necessary.

/ / /

/ / /

/ / /

DATED:  November 17, 2020                    HANSON BRIDGETT LLP


                                    By: _____/s/ Davina Pujari_____
                                        DAVINA PUJARI
                                        SAMIR J. ABDELNOUR
                                        ROSSLYN HUMMER
                                        MELISSA M. MALSTROM
                                        Attorneys for Plaintiff
                                        TETRA TECH EC, INC.

COMPLAINT FOR DECLARATORY RELIEF

# EXHIBIT A

# EXHIBIT A



**Figure 2.  Parcel G Location Map**